IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| BECKY WISE and JAY WISE, as Surviving Parents of LILY WISE, | |
| | Civil Action File No. |
| Plaintiffs, | 4:20-cv-00191-SEG |
| v. | |
| VALERIE SMITH, CNM; and HARBIN CLINIC, LLC; | |
| Defendants. | Conference is requested. |

## **THIRD AMENDED CONSOLIDATED PRETRIAL ORDER**

Pursuant to Federal Rule 16, Local Rule 16.4, and this Court's Standing Order, the parties file this consolidated pretrial order.

1. There are no motions or other matters pending for consideration by the court except as noted: **Motions in limine.**

2. All discovery has been completed, unless otherwise noted, and the court will not consider any further motions to compel discovery. Provided there is no resulting delay in readiness for trial the parties shall, however, be permitted to take the depositions of any persons for the preservation of evidence for use at trial. **All discovery is complete. All depositions have been taken.**

3. Unless otherwise noted, the names of the parties as shown in the caption to this Order and the capacity in which they appear are correct and complete, and there is no question by any party as to the misjoinder or non-joinder of any parties. **None**.

4. Unless otherwise noted, there is no question as to the jurisdiction of the court; jurisdiction is based upon the following code sections: **28 U.S.C. § 1332.**

5. The following individually named attorneys are hereby designated as lead counsel for the parties:

   **Plaintiffs: Nelson O. Tyrone III; Robert K. Finnell; Meredith M. Parrish; Leighton Moore.**

   **Defendants: Eric J. Frisch; Defendants object to Plaintiffs designating four lead counsel, as only one attorney should be considered lead. If Plaintiffs are going to name all attorneys, then Defendants include D. Gary Lovell, Jr. as additional "lead" counsel.**

6. Normally, the plaintiff is entitled to open and close arguments to the jury. State below the reasons, if any, why the plaintiff should not be permitted to open arguments to the jury.

   **Plaintiffs: There is no reason that plaintiff should not be entitled to open and close arguments to the jury.**

**Defendants: None.**

7. The captioned case shall be tried to a jury.

8. State whether the parties request that the trial to a jury be bifurcated, i.e. that the same jury consider separately issues such as liability and damages. State briefly the reasons why trial should or should not be bifurcated.

   **The parties prefer a unified trial for the sake of judicial economy; a bifurcated trial is not necessary.**

9. Attached hereto as Attachment "A" and made a part of this order by reference are the questions which the parties request that the court propound to the jurors concerning their legal qualifications to serve.

10. Attached hereto as Attachment "B-1" are the general questions which plaintiff wishes to be propounded to the jurors on voir dire examination. Attached hereto as Attachment "B-2" are the general questions which defendant wishes to be propounded to the jurors on voir dire examination. The Court shall question the prospective jurors as to their address and occupation and as to the occupation of a spouse, if any. Counsel may be permitted to as follow-up questions on these matters. It shall not, therefore, be necessary for counsel to submit questions regarding these matters. The determination of whether the

judge or counsel will propound general voir dire questions is a matter of courtroom policy which shall be established by each judge.

11. State any objections to plaintiff's voir dire questions:

   **The parties have agreed to reserve objections to voir dire questions at this time.**

   State any objections to defendant's voir dire questions:

   **The parties have agreed to reserve objections to voir dire questions at this time.**

12. All civil cases to be tried wholly or in part by jury shall be tried before a jury consisting of not less than six (6) members, unless the parties stipulate otherwise. The parties must state in the space provided below the basis for any requests for additional strikes. Unless otherwise directed herein, each side as a group will be allowed the number of peremptory challenges as provided by 28 U.S.C. § 1870. See Fed.R.Civ.P. 47(b).

13. State whether there is any pending related litigation. Describe briefly, including style and civil action number. **None.**

14. Attached hereto as Attachment "C" is plaintiff's outline of the case which includes a succinct factual summary of plaintiff's cause of action and which shall be neither argumentative nor recite evidence. All relevant rules,

regulations, statutes, ordinances, and illustrative case law creating a specific legal duty relied upon by plaintiff shall be listed under a separate heading. In negligence cases, each and every act of negligence relied upon shall be separately listed. For each item of damage claimed, plaintiff shall separately provide the following information: (a) a brief description of the item claimed, for example, pain and suffering; (b) the dollar amount claimed; and (c) a citation to the law, rule, regulation, or any decision authorizing a recovery for that particular item of damage. Items of damage not identified in this manner shall not be recoverable.

Defendants object to Attached C to the extent it references acts or omissions by Dr. Spivey, who Plaintiffs voluntarily dismissed from the case. Specifically, this includes contention numbers 21-23 and any other references to Dr. Spivey. This has been briefed in Defendants' motion *in limine*.

15. Attached hereto as Attachment "D" is the defendant's outline of the case which includes a succinct factual summary of all general, special, and affirmative defenses relied upon and which shall be neither argumentative nor recite evidence. All relevant rules, regulations, statutes, ordinances, and illustrative case law creating a specific legal duty relied upon as creating a defense shall be listed under a separate heading. For any counterclaim, the

defendant shall separately provide the following information for each item of damage claimed: (a) a brief description of the item claimed; (b) the dollar amount claimed; and (c) a citation to the law, rule, regulation, or any decision authorizing a recovery for that particular item of damage. Items of damage not identified in this manner shall not be recoverable.

16. Attached hereto as Attachment "E" are the facts stipulated by the parties. No further evidence will be required as to the facts contained in the stipulations and the stipulation may be read into evidence at the beginning of the trial or at such other time as is appropriate in the trial of the case. It is the duty of counsel to cooperate fully with each other to identify all undisputed facts. A refusal to do so may result in the imposition of sanctions upon the non-cooperating counsel.

17. The legal issues to be tried are as follows:

**Plaintiffs**: Plaintiffs' case sounds in professional malpractice/negligence. Negligence in this action is defined as a violation of the Standard of Care. The Standard of Care in Georgia is defined as the level of care and skill that a reasonably competent healthcare professional would provide under similar circumstances. Proximate cause, damages, and apportionment of fault are also at issue in Plaintiffs' case.

9477630v.1

**<u>Defendants</u>**:

    **<u>1.</u>** The standard of care applicable to Valerie Smith, CNM as a nurse midwife

    **<u>2.</u>** Whether Ms. Smith violated the applicable standard of care

    **<u>3.</u>** Whether Ms. Smith's alleged violations of the standard of care were the cause-in-fact of the death of the baby

    **<u>4.</u>** Whether Ms. Smith's alleged violations of the standard of care were the proximate cause of the death of the baby

    **<u>5.</u>** Damages, if any

    **<u>6.</u>** Apportionment of fault, apportionment of damages, and/or setoff as it relates to Cartersville Medical Center, Ashley Allgood, RN, and any other nurse at Cartersville Medical Center who provided care to Becky Wise during the events at issue

Defendants object to gross negligence going to the jury unless the Court rules this case is governed by O.C.G.A. §51-1-29.5. If the Court rules that Section 51-1-29.5 does not apply, then the case only sounds in professional malpractice/negligence and the jury should only determine whether Defendants violated the applicable professional standard of care. As for

apportionment of fault and setoff, the parties have briefed these issues for the Court's consideration.

18. Attached hereto as Attachment "F-1" for the plaintiff and Attachment "F-2" for the defendant is a list of all witnesses and their addresses for each party. The list must designate the witnesses whom that party will present at trial and those witnesses whom the party may have present at trial. Expert (any witness who might express an opinion under Federal Rule of Evidence 702), impeachment and rebuttal witnesses whose use as a witness can be reasonably anticipated must be included. Each party shall also attach to the list a reasonable specific summary of the expected testimony of each expert witness.

All of the other parties may rely upon a representation by a designated party that a witness will be present unless notice to the contrary is given ten (10) days prior to trial to allows the other party(s) to subpoena the witness or to obtain the witness' testimony by other means. Witnesses who are not included on the witness list (including expert, impeachment and rebuttal witnesses whose use should have been reasonably anticipated) will not be permitted to testify, unless expressly authorized by court order based upon a showing that the failure to comply was justified.

The parties reserve the right to use impeachment materials and demonstrative aids as allowed by law without being listed herein, including but not limited to medical literature and other statements and testimony.

19. Attached hereto as Attachment "G-1" for the plaintiff and "G-2" for the defendant are the typed lists of all documentary and physical evidence that will be tendered at trial. Learned treatises which are expected to be used at trial shall not be admitted as exhibits. Counsel are required, however, to identify all such treatises under a separate heading on the party's exhibit list. Each party's exhibits shall be numbered serially numbered beginning with 1, and without the inclusion of any alphabetical or numerical subparts. Adequate space must be left on the left margin of each list for court stamping purposes. A courtesy copy of each party's list must be submitted for use by the judge. Prior to trial, counsel shall mark the exhibits as numbered on the attached lists by affixing yellow stickers to plaintiff's exhibits, numbered blue stickers to defendant's exhibits, and numbered white stickers to joint exhibits. When there are multiples plaintiffs or defendants, the surname of the particular plaintiff or defendant shall be shown above the number on the stickers for that party's exhibits.

9477630v.1

Specific objections to another party's exhibits must be typed on a separate page and must be attached to the exhibit list of the party against whom the objections are raised. Objections as to authenticity, privilege, competency, and, to the extent possible, relevancy of the exhibits shall be included. Any listed document to which an objection is not raised shall be deemed to have been stipulated as to authenticity by the parties, and such documents will be admitted at trial without further proof of authenticity.

Unless otherwise noted, copies rather than originals of documentary evidence may be used at trial. Documentary or physical exhibits may not be submitted by counsel after filing of the pretrial order, except upon consent of all the parties or permission of the Court. Exhibits so admitted must be numbered, inspected by counsel, and marked with stickers prior to trial.

Counsel shall familiarize themselves with all exhibits (and the numbering thereof) prior to trial. Counsel will not be afforded time during trial to examine exhibits that are or should have been listed herein.

20. The following designated portions of the testimony of the persons listed below may be introduced by deposition:

**By Plaintiffs:**

a. Ashley Allgood, RN;

b.  Kelly Costner, RN;

c.  Sarah Glouse, RN;

d.  Jacquelyn Bodea, DNP, CNM, WHNP;

e.  John Gibson, Jr., CPA/ABV, CVA;

f.  Debra Heller, M.D.;

g.  Frank Manning, M.D.;

h.  Chadburn Ray, M.D.;

i.  Frances Sahrphillips, RN, CNM.

**By Defendants:**

Defendants object to Plaintiffs' list. The people listed are all experts specially retained for purposes of litigation by Defendants. Defendants anticipate calling them live at trial or taking a deposition to preserve evidence.

1.  Ashley Allgood

2.  Kelly Costner

3.  Sarah Glouse

4.  Edward McBride, as corporate representative of Harbin Clinic, LLC

5.  Steven A. Spivey, as corporate representative of Harbin Clinic, LLC

6. Defendants designate the entire depositions of Dr. Rebecca Baergen and Dr. Debra Heller, which were taken for preservation of evidence. There are no objections that need a ruling before trial in the depositions.

Any objections to the depositions of the foregoing persons or to any questions or answers in the depositions shall be filed in writing no later than the day the case is first scheduled for trial. Objections not perfected in this manner will be deemed waived or abandoned. All depositions shall be reviewed by counsel and all extraneous and unnecessary matters, including non-essential colloquy of counsel, shall be deleted. Depositions, whether preserved by stenographic means or videotape, shall not go out with the jury.

21. Attached hereto as Attachments "H-1" for the plaintiff and "H-2" for the defendant are any trial briefs which counsel may wish to file containing citations to legal authority on evidentiary questions and other legal issues which counsel anticipate will arise during the trial of the case. Limitations, if any, regarding the format and length of trial briefs is a matter of individual practice which shall be established by each judge.

22. In the event this is a case designated for trial to the court with a jury, requests to charge must be submitted no later than 9:30 a.m. on the date on which the case is calendared (or specially set) for trial. Requests which are not timely

9477630v.1

filed and which are not otherwise in compliance with LR 51.1, will not be considered. In addition, each party should attach to the requests to charge a short (not more than one (l)-page) statement of that party's contentions, covering both claims and defenses, which the court may use in its charge to the jury.

Counsel are directed to refer to the latest edition of the Eleventh Circuit District Judges Association's Pattern Jury Instructions and Devitt and Blackmar's Federal Jury Practice and Instructions in preparing the requests to charge. For those issues not covered by the Pattern Instructions or Devitt and Blackmar, counsel are directed to extract the applicable legal principal (with minimum verbiage) from each cited authority.

Defendants' statement of the contentions, claims, and defenses is attached as H-2, below.

23. If counsel desire for the case to be submitted to the jury in a manner other than upon a general verdict, the form of submission agreed to by all counsel shall be shown in Attachment "I" to the Pretrial Order. If counsel cannot agree on a special form of submission, the parties will propose their separate forms for the consideration of the court.

9477630v.1

24. Unless otherwise authorized by the court, arguments in all jury cases shall be limited to one-half hour for each side. Should any party desire any additional time for argument, the request should be noted (and explained) herein.

**<u>Plaintiffs:</u> Plaintiffs request up to one hour for closing arguments. This is a complex medical malpractice case. Plaintiffs carry the burden of proof for every element of damages. As this is an obstetric malpractice case the medical issues will be outside of the experience of nearly all men and, perhaps, some women who have not been pregnant or delivered children. Plaintiffs must also present the jury with a reasonable basis for including damages in this case. The legal issues: Standard of Care, medical negligence, and causation are beyond the experience of the average juror. In order to provide the jury a framework for considering these issues counsel will need to address each of them. Finally, determining damages for the loss of an adult is challenging to any juror. Doing so for the life of baby is particularly perplexing. Plaintiffs are already faced with the burden of proof in this case. Given the complex issues outlined above, limiting Plaintiffs to thirty minutes total for closing argument does not provide Plaintiffs with sufficient time to address these issues. Nor does it give Plaintiffs enough time to assist the jury in their very serious task of**

deciding this case. **Defendants**: **This is a wrongful death case. While Defendants agree there are issues medicine and multiple witnesses to introduce, they believe that thirty (30) minutes for opening statements and closing arguments per side is sufficient.**

25. If this case is designated for trial to the court without a jury, counsel are directed to submit proposed finding of fact and conclusions of law not later than the opening of trial. **Not applicable.**

26. Pursuant to LR 16.3, lead counsel and persons possessing settlement authority to bind the parties met in person on ***to be scheduled*** to discuss in good faith the possibility of settlement of this case. The Court has not discussed settlement of this case with counsel. Plaintiffs state that at this time there appears to be little possibility of settlement. Defendants state that there is a possibility of settlement, and Defendants anticipate meeting with Plaintiffs in the foreseeable future to discuss.

The parties have conferred about settlement and were not in a position to reach a settlement agreement as of the date of this proposed pretrial order.

27. Unless otherwise noted, the court will not consider this case for a special setting, and it will be scheduled by the clerk in accordance with the normal practice of the court. **Both Plaintiffs and Defendants request a special**

**setting for this case. Both sides have retained multiple medical experts (physicians, midwives, and nurses) who must travel from out-of-state to provide testimony at trial. This is practically impossible without a special setting. Plaintiffs and Defendant jointly request a brief telephonic or Zoom conference with the Court to discuss a trial setting.**

28. The plaintiff estimates that it will require 2-3 days to present its evidence. The defendant estimates that it will require 3-4 days to present its evidence. It is estimated that the total trial time is 5-7 days.

    Defendants understand the Court has set the case for 5 trial days and expects to discuss the trial schedule in detail during the pretrial conference.

29. IT IS HEREBY ORDERED that the above constitutes the pretrial order for the above captioned case (_____) submitted by stipulation of the parties or (_____) approved by the court after conference with the parties.

    IT IS FURTHER ORDERED that the foregoing, including the attachments thereto, constitutes the pretrial order in the above case and that it supersedes the pleadings which are hereby amended to conform hereto and that this pretrial order shall not be amended except by Order of the court to prevent manifest injustice. Any attempt to reserve a right to amend or add to any part of the pretrial order after the pretrial order has been filed shall be

invalid and of no effect and shall not be binding upon any party or the court, unless specifically authorized in writing by the court.

IT IS SO ORDERED this _____ day of _____ 2025.

_____

UNITED STATES DISTRICT JUDGE
HONORABLE SARAH E. GERAGHTY

Each of the undersigned counsel for the parties hereby consents to the entry of the foregoing pretrial order, which has been prepared in accordance with the form pretrial order adopted by this court.

/s/ Nelson Tyrone
Nelson O. Tyrone
Georgia Bar No. 721189
Meredith M. Parrish
Georgia Bar No. 860793

TYRONE LAW FIRM
1819 Peachtree Road NE, Suite 400
Atlanta, Georgia 30309
(404) 377-0017 telephone
(404) 249-6764 facsimile
nelson@tyronelaw.com
meredith@tyronelaw.com

/s/ Robert K. Finnell
Robert K. Finnell
Georgia Bar No. 261575

THE FINNELL FIRM
Post Office Box 63
Rome, Georgia 30162

(706) 235-7272 telephone
(706) 235-9461 facsimile
bob@finnellfirm.com

*/s/ Leighton Moore*
Leighton Moore
Georgia Bar No. 520701

THE MOORE LAW FIRM, P.C.
1819 Peachtree Road NE, Suite 403
Atlanta, Georgia 30309
leighton@moorefirmpc.com

*Attorneys for Plaintiffs Becky and Jay Wise*

*/s/ Eric J. Frisch*
Eric J. Frisch
Georgia Bar No. 261683
D. Gary Lovell, Jr.
Georgia Bar No. 459389

COPELAND, STAIR, VALZ & LOVELL, LLP
One Ninety-One Peachtree Tower
191 Peachtree Street NE, Suite 3600
Atlanta, Georgia 30303
404-522-8220 telephone
efrisch@csvl.law
glovell@csvl.law

*Attorneys for Defendants Valerie Smith, CNM, and Harbin Clinic, LLC*

## ATTACHMENT A (REQUESTED QUALIFICATION QUESTIONS TO JURORS)

**Plaintiffs**

a. Are you over the age of 18?

b. Are you a United States Citizen?

c. Are any of you NOT a resident of the Northern District of Georgia, Rome Division (i.e., the following counties: Bartow, Catoosa, Chattooga, Dade, Floyd, Gordon, Murray, Paulding, Polk, Walker and Whitfield)?

d. Have any of you not lived here for at least one year?

e. Are you proficient in the English language?

f. Are you currently subject to felony charges punishable by imprisonment for more than one year?

g. Have you ever been convicted of a felony wherein your civil rights have not been legally restored?

h. Are any of you shareholders, directors, employees, or officers of the following corporations: Harbin Clinic, LLC? (Cartersville Medical Center?)

i. Are any of you officers, directors, stockholders, policyholders of MAG Mutual insurance company?

j.  Is there anything that would make it difficult for the juror to sit through a trial day and observe, listen to, and understand the evidence in this case.

k.  Is there anything else that might prevent the juror from being able to complete service for this trial if selected as juror?

**Defendants**

Defendants join in Plaintiffs' Requested Qualification Questions, above, except as follows:

Defendants request the Court prequalify the jury as to MAG Mutual to avoid emphasizing the existence of insurance coverage for the defendants.

9477630v.1

# ATTACHMENT B-1 (PLAINTIFFS' PROPOSED GENERAL VOIR DIRE QUESTIONS)

Plaintiffs request they be allowed to ask potential jurors the following questions, along with follow-up questions as indicated and appropriate:

1. Who here has ever been treated at a hospital, someone they love has been treated at a hospital?

2. What are/were your expectations about the care you or your loved one received?

    a. What can happen if your expectation is not met?

    b. What's important about that, and how important to you were your expectations concerning the care provided?

    c. (Same follow up questions for remainder of questions).

3. What was your expectation about who was leading your care?

4. What was your expectation about whether you were being cared for one person, or by a team of people?

5. Have you ever been cared for by a Nurse Practitioner?

6. Have you ever been cared for by a Midwife?

7. What was your expectation about how the people caring for you would work together?

8. What was your expectation about what would happen when a member of your care team's shift ended?

9477630v.1

9. What was your expectation about what information about your health and treatment would be communicated to you?

10. What was your expectation about whether you would be involved in decisions about next steps in your care?

11. How many of you have feelings against personal injury lawsuits, based on experiences, things you've read or heard, opinions, feelings or beliefs, or some level of distrust or dislike, or for any other reason?

    a. Tell me about that.

    b. How strongly do you feel about this topic?

12. How many of you have feelings against large verdicts?

    a. What kinds of large verdicts have you heard about and what feelings do you have about them?

    b. How strongly do you feel about this topic?

13. How many of you have feelings against providing money where someone is hurt?

    a. Do you feel like this is a just system? Do you have religious or moral views that would make it hard for you to do award money damages to a person who has been harmed? What about other personal views on this topic?

    b. How strongly do you feel about this topic?

14. How many of you have feelings against providing money where someone has died? Put another way – since money won't bring people back, does anyone think about this topic and wonder, "what's the point" in awarding money damages where someone has died?

    a. Do you feel like this is a just system?

    b. What about other personal views on this topic?

15. Some people have religious views that tell them that when someone dies "it is God's Will" – even if that person is a baby. Do you have religious views at all like this? What about religious or moral views that would make it hard for you to award money damages where someone has died.

16. Does anyone know Valerie Smith, CNM? (Have you or a loved one been a patient of Certified Midwife Smith? What was your experience? Are you still a patient? Would it be difficult for you to judge Certified Midwife Smith equally to other witnesses; do you think you would have some bias based on your experience with Certified Midwife Smith?)

17. Does anyone know Stephen Spivey, M.D.? (Same follow-up questions as above)

18. Has anyone been a patient at Harbin Clinic? (Same follow-up questions as above)

19. Has anyone been a patient at Cartersville Medical Center? (Same follow-up questions)

9477630v.1

20. Does anyone know Ashley Allgood RN? (Have you or a loved one been a patient of Nurse Allgood? Same follow-up questions)

21. Does anyone know Kelly Costner RN? (Have you or a loved one been a patient of Nurse Costner? Same follow-up questions)

22. Does anyone know Sarah Glouse RN? (Have you or a loved one been a patient of Nurse Glouse? Same follow-up questions)

23. Does anyone know attorney Eric Frisch? Is anyone familiar with his firm, Copeland, Stair, Valz & Lovell, or does anyone know other attorneys who practice with that firm? (Same questions re. former client).

24. Without hearing the evidence in this case, do you have any strong personal beliefs for or against civil lawsuits?

25. Without hearing the evidence in this case, do you have any strong personal beliefs for or against awarding money damages for loss of life?

9477630v.1

# ATTACHMENT B-2 (DEFENDANTS' PROPOSED GENERAL VOIR DIRE QUESTIONS)

Anyone know Becky Wise in any way?

Anyone know Joshua Wise in any way?

    He also went by Jay Wise?

At the time of the events, they lived at 115 Howard Avenue in Cartersville?

    Does this make you believe you may know them?

Jay Wise was in the Marine Corps. at the time of the events. Does this make you believe you may know him?

    Does this make you more likely to believe his version of the events for any reason?

Has anyone read or heard anything about the death of Lily Wise before today?

    Does anyone remember reading, viewing, or hearing news coverage related to this?

    Online articles

    Social media, such as Facebook, Reddit, or Twitter

Does anyone know any of the following:

Anyone ever been a patient of Dr. Steven Spivey?

    Heard or read anything negative about Dr. Steven Spivey?

Anyone ever been a patient of Valerie Smith?

    Ms. Smith is a certified nurse midwife.

    Heard or read anything about Ms. Smith?

9477630v.1

Anyone have an opinion about whether obstetrical care can be provided by a certified nurse midwife?

Anyone ever been a client of Bob Finnell, an attorney in Rome?

Anyone ever been a client of Nelson Tyrone, an attorney in Atlanta?

Affiliated on social media with Mr. Finnell or Mr. Tyrone?

Other people in Mr. Tyrone's office are Meredith Parrish and Cynthia Poe. Anyone know them?

Affiliated on social media with them?

Anyone ever been a client of Leighton Moore or The Moore Law Firm?

Mr. Moore is an attorney in Atlanta

Anyone affiliated on social media with Mr. Moore?

Anyone have a negative interaction with Harbin Clinic?

Anyone have a negative interaction with any medical provider at Harbin Clinic?

Anyone filed a lawsuit seeking to recover money from a person or a company?

Anyone have family members who have filed a lawsuit seeking to recover money from a person or a company?

Anyone file a lawsuit seeking worker's compensation benefits?

Anyone have a family member who has filed a lawsuit seeking worker's compensation benefits?

Anyone thought about filing a lawsuit but didn't for any reason?

Anyone ever served as the administrator of someone's estate after they died?

9477630v.1

Anyone ever been sued?

Anyone have a family member who has been sued?

Anyone filed a lawsuit against a doctor, hospital or health care provider?

Anyone in your family ever file a lawsuit against a doctor, hospital, or health care provider?

Anyone ever submitted a grievance or complaint to a regulatory authority regarding a healthcare provider?

> For example, the Georgia Composite Board of Medical Examiners?

Anyone think that just because a lawsuit made it this far, there must be some merit to it?

## Know anyone else in the audience

> Related to anyone in the audience

Anyone ever served on a jury before?

Anyone ever serve as the foreperson of a jury?

Anyone have medical training or experience?

Anyone have family members with medical training or experience?

Anyone work in a doctor's office or hospital?

Anyone have a family member who works in a doctor's office or hospital?

Anyone ever sought a second opinion from a doctor?

Anyone have a family member who has sought a second opinion from a doctor?

Anyone familiar with the following local healthcare providers:

> Cartersville Medical Center

Sarah Glouse, a nurse at Cartersville Medical Center

Ashley Allgood, a nurse at Cartersville Medical Center

Kelly Costner, a nurse at Cartersville Medical Center

Dana McBurnett, a nurse at Cartersville Medical Center

Hannah Wilson, a nurse at Cartersville Medical Center

Rachel Turner, a nurse at Cartersville Medical Center

Lauren Brown, a nurse at Cartersville Medical Center

Catherine Creamer, a nurse at Cartersville Medical Center

Rebecca Evans, a certified nurse midwife in Cartersville

Courtney Perez, a doctor in Cartersville

Annalise Crawley, a doctor in Cartersville

Hugh Ribot, a doctor in Cartersville

Beverly Rogers, a doctor in Atlanta

Fayyaz Barodawala, a doctor who used to be in Cartersville

Jordan Doss, a radiological technologist in Cartersville

Courtney Perez, a doctor in Cartersville

Anyone know anyone who works at:

Harbin Clinic

Cartersville Medical Center

Anyone know any of the following, who may be witnesses in the case:

Reid Goodman, a doctor from Golden, Colorado

Pam Kelley, a nurse and nurse midwife from Florida

Mark Landon, a doctor from Columbus, Ohio

Rebecca Baergen, a doctor in New York

Bruce Seaman, who used to be a professor at Georgia State and Georgia Tech

Have any of you had a "bad experience" or a "poor experience" with a doctor, hospital or other health care provider?

Anyone have a family member who has had a "bad experience" with a doctor, hospital or other health care provider?

Anyone ever experienced a miscarriage?

Immediate family member who has?

Anyone ever suffered death of a baby before birth?

Immediate family member who has?

Anyone a member of any support, social, or similar groups related to birth experiences?

Anyone ever made a complaint about the care a doctor provided?

Either for yourself or someone you care about?

Do any of you here believe that today's care providers in general are less caring toward their patients than they should be?

Anyone feel that they have been the subject of medical malpractice?

Doctor, nurse, anyone at a medical facility

Family or friends you know about?

Anyone feel that doctors must always have the answer about what is wrong with someone?

Anyone had a situation with a healthcare provider in which questions were left unanswered?

Has anyone close to you ever had a bad experience with a doctor, hospital, or another type of care provider that you felt should have been avoided or prevented?

Have you or anyone close to you ever had serious complications following a medical procedure?

Have you ever had a medical condition that went undiagnosed, was misdiagnosed, or was not timely diagnosed by a doctor or another healthcare provider?

Has anyone close to you ever had a medical condition that went undiagnosed, was misdiagnosed, or was not timely diagnosed by a doctor or another healthcare provider?

Do any of you think that doctors who work in hospitals do not monitor patients as closely as they should?

Do any of you think that doctors who work in hospitals are not as vigilant or watchful as they should be?

Are of you would say you are dissatisfied with the quality of the healthcare that you (and your family) have access to?

Does anyone feel that the actual number of instances of medical malpractice that occur today are under-reported (i.e., medical malpractice happens more often than we
know)?

Is anyone already leaning toward the individual who filed this lawsuit against the doctors and hospital, even if it is ever so slightly?

Anyone ever had an unexpected outcome from a medical procedure?

Family member?

Friend?

Anyone ever experienced a complication from a medical procedure?

Family member?

Friend?

Anyone have a job where you respond to customer or consumer complaints?

Anyone have a job where you have to show up at specific hours?

Anyone have a job where you are required to be available around the clock?

On-call?

Anyone have a job where you work at multiple locations?

Anyone have a job where they are responsible for preparing written policies or procedures?

Anyone have a job where they are responsible for monitoring and ensuring compliance with written policies and procedures?

Anyone ever been responsible for investigating an incident at your place of employment?

Anyone ever been responsible for disciplining or counseling employees at your place of employment?

Anyone serve in the military?

Anyone ever been involved in a court martial?

Anyone ever work as a pharmacist or in a pharmacy?

You should not decide the case based on sympathy.

9477630v.1

Is there anyone who will disagree if the court charges that you should not decide on sympathy?

Anyone feel that, for whatever reason, they cannot set aside sympathy in deciding this case?

Is there anyone who believes that because of their feelings of sympathy, they cannot be fair and impartial for any reason?

Does anyone think because of sympathy, they would feel negative feelings toward a physician, nurse or provider defendant?

Is there anyone who feels they cannot put sympathy aside in determining damages in this case?

9477630v.1

## ATTACHMENT C (PLAINTIFFS' OUTLINE OF THE CASE)

### 1. Factual Summary:

Becky Wise presented to Labor and Delivery triage at Cartersville Medical Center at or around 10:17 a.m. on August 24, 2018. She was 39 weeks pregnant and had experienced a normal and uncomplicated pregnancy. This was Mrs. Wise's first pregnancy and she had come to the hospital with her husband Jay because she believed she was having contractions. All the experts in this case agree that Mrs. Wise's baby, Lily, was healthy when she arrived. Eight hours later Mrs. Wise would be told that Lily had died, in utero, from lack of oxygen. The doctor, Steven Spivey came to the hospital and delivered Lily, stillborn, by Cesarean Section.

Plaintiffs contend that all the members of Becky and Lily Wise's team – the Labor and Delivery Nurses at Cartersville Hospital, Certified Midwife Valerie Smith, and Obstetrician Steven Spivey all violated the Standard of Care and caused and contributed to Lily's death. In fact, had any of them done their jobs Lily would be alive today. She would be six and a half years old. Although the entire team failed Mrs. Wise and Lily Certified Midwife Smith (and her employer Harbin Clinic) are the only Defendants in the current litigation.

When Mrs. Wise arrived at Cartersville Medical Center Valerie Smith, a Certified Nurse Midwife with Harbin Clinic was "on call" for patients of Harbin

Clinic at Cartersville Medical Center. Mrs. Wise had received prenatal care from Harbin and had seen Certified Midwife Smith in the practice a week before.

Certified Midwife Smith assumed care Mrs. Wise and Lily around 11:00 a.m. that morning when she was contacted by a Nurse at Cartersville Medical Center and began directing Mrs. Wise and Lily's care. Certified Midwife Smith entered Orders including to place Lily on the Fetal Heart Monitor ("FHM") and to perform a "Nonstress Test". Fetal Heart Monitoring is an indirect assessment of a baby's oxygen. It is the primary means of checking on the wellbeing of a baby during labor and delivery by monitoring the baby's heart rate with special equipment. When interruptions in the baby's oxygen supply occur, the baby responds with detectable heart rate changes on FHM. Nurses, Midwives and Doctors are trained to extrapolate from the baby's heart rate pattern on FHM whether the baby is getting sufficient oxygen or is, instead suffering from reduced oxygen (hypoxia).

When Lily's FHM monitoring began, the initial monitoring indicated that Lily was healthy and un-injured and was receiving sufficient oxygen. Mrs. Wise had told the nurses when she arrived that her baby, Lily, had not been moving as much as normal. Nurses, Midwives and Obstetrics doctors know that a baby who is not moving as much ("Reduced Fetal Movement") may be a sign that the baby is not getting enough oxygen. There is a factual dispute about whether Midwife Smith was aware of Mrs. Wise's complaint. The nurse, Ashley Allgood, R.N. testified that she

34

"would" have told Certified Midwife Smith but agrees that she did not chart that she did.

Shortly after Mrs. Wise's arrival Lily's heart monitoring showed signs of oxygen reduction. By 11:30 a.m. Mrs. Wise's FHM monitoring constituted a "nonreactive" Nonstress Test which is concerning for reduced oxygen to the baby. A Nonstress Test takes the initial period of Fetal Heart Monitoring (FHM) and identifies whether "accelerations" (15 second "jumps" of the fetal heart rate for 15 beats above baseline) can be measured. Accelerations of the fetal heart rate are caused by babies who move sufficiently in utero to make their heart rate "accelerate". These accelerations are strongly correlated with a baby who is getting sufficient oxygen because only well-oxygenated babies move enough in-utero to cause them. A NST test that demonstrates sufficient accelerations is termed "reactive". A test without sufficient accelerations is deemed "nonreactive". The lack of accelerations (a nonreactive NST) can be an indicator of reduced oxygen to the baby (hypoxia).

Lily's NST results were "nonreactive". The nurse notes state that Smith was updated on Mrs. Wise's status at 11:39 a.m. including the nonreactive NST results. The nurse believes she would have told Smith other features of the FHM tracing indicating reduced oxygen like "minimal" variability and "decelerations" of the baby's heart rate, but that she did not chart these. There is a factual dispute on this

issue as well. Certified Midwife Smith has testified that she was not told of these features.

Once she was made aware of Lily's "nonreactive" NST test results the Standard of Care required Certified Midwife Smith to recognize that Lily might be suffering from ongoing reduced oxygen (hypoxia) and for her to personally review and evaluate Lily's ongoing FHM monitoring. Certified Midwife Smith did not do this. Had she reviewed Lily's FHM monitoring Certified Midwife Smith would have recognized that Lily's FHM monitoring showed several features consistent with reduced oxygen to Lilly beyond "just" the lack of accelerations (i.e. "nonreactivity") of her heart rate. These additional features Midwife Smith would have seen include: a continued lack of accelerations, decelerations (drops) of Lily's heart rate including "late" decelerations (caused by poor placental function) and "variable" decelerations (caused by cord compression), and "minimal" variability. Each of these individually (and together) indicate an interruption of the oxygen pathway to Lily and, therefore, reduced oxygen to her.

Because the nonreactive Nonstress test raised concerns about whether Lily was getting sufficient oxygen, Midwife Smith and her supervising physician, Dr. Spivey, ordered a "Biophysical Profile" (BPP) test as a follow-up test to check on Lily's oxygen. A BPP test is a noninvasive ultrasound that gathers information on four biophysical parameters of the baby (body movement, muscle tone, "breathing"

movement[1], and amniotic fluid volume) all connected to the baby's Central Nervous function and indicators of potential oxygen reduction to the baby. The BPP test is based on the concept that the four parameters of the test are mediated by neurological pathways and therefore reflect the Central Nervous System status of the baby at the time of the examination. Each of the parameters is given either zero or two points. The NST result is added to the score (zero for nonreactive and two points for reactive) for a ten (10) point total score. A score of 6 out of 10 is considered an "equivocal" score, meaning that the baby may (or may not be) getting enough oxygen. Lily's Biophysical profile results were communicated to Certified Midwife Smith at 2:35 p.m. as 6 out of 10. Lily's BPP testing also indicated that two of the points subtracted were subtracted because Lily showed "no muscle tone" – meaning the tester could not identify that Lily either flexed or extended her arms or legs or open or closed her hand. A finding of "no tone" is very concerning for hypoxia. In fact, babies with a 6 out of 10 but have no tone have four (4) times the intrapartum death rate (stillborn) compared to babies with just an "equivocal" 6 out of 10 score. Midwife Smith responded to the Nurse that she was in a delivery with another patient and would "call Dr. Spivey" about the test results when she was out of the delivery. Midwife Smith, by her testimony, got out of her delivery and left the hospital sometime around 3:00 p.m.

---

[1] The "breathing" movement is the result of practice breathing the baby does in – utero while receiving oxygen from the mothers oxygenated blood to prepare the baby for breathing air once delivered.

Upon learning the BPP results, the Standard of Care required Smith to – rather than leave the hospital – review Lily's FHM monitoring to investigate signs of ongoing oxygen deprivation. Smith had several ways to do this – she had the ability to review Lily's FHM monitoring at Mrs. Wise's bedside, on the central monitoring at the Nurse's station, at the Doctor's Lounge, or on her phone with a program called "Airstrip". Having reviewed Lily's FHM monitoring Smith should have recognized that Lily had been off monitor from around 2 p.m. and remained off monitor to 3:15, and that her FHM monitoring prior to 2 p.m. indicated an ongoing interruption of Lily's oxygen supply as did her FHM monitoring after 3:15. Smith needed to call Dr. Spivey and share with him what she knew and ask him to come to the hospital to deliver Lily by C-Section. If Smith couldn't reach Dr. Spivey or if Dr. Spivey was unwilling to come immediately to the hospital, she needed to use the Chain of Command. Smith needed to discuss these test results with Lily's mother so Lily's mother could participate in the decision about how to deliver Lily. Smith needed to investigate by asking Lily's mother, asking the Nurse, or by reviewing the chart if Lily had been moving less. Smith needed to recommend for Lily to be delivered by unscheduled C-Section.

Smith did none of these. Instead, she left the hospital without ever speaking with Mrs. Wise, looking at Lily's chart or speaking with the Nurse, or looking at Lily's FHM monitoring, and returned to her office.

At or around 3:25 p.m., Smith and Dr. Spivey faxed an Order for Mrs. Wise to be "induced" by Cervadil meaning that Mrs. Wise was to be given medications to trigger her cervix to ripen increase the strength and duration of her contractions. This was the exact opposite approach to protect Lily. Because it triggers contractions (which reduce oxygen to the baby) induction is contraindicated by both the Standard of Care and by Cartersville Medical Policy. Inductions in a first-time mom who is remote from delivery can also take from several hours to days to deliver a baby vaginally

At 3:48 p.m., Lily's FHM tracing stopped tracing her heart. We cannot assume that the FHM stopped tracing Lily's heart because her heart stopped. But this is the last point we have consistent, ongoing monitoring of her heartbeat. Lily's Nurses were not paying enough attention to her monitoring and delayed recognizing her heart was not being traced. At 4:43 p.m. Lily's nurses charted that they were having difficulty tracing her heartbeat and that they were checking (and rechecking) different parts of the FHM machine but did not call for help. The Nurses have testified that the continued to be able to hear Lily's heartbeat (indicating that Lily was still alive) as late as approximately 5:00 p.m.

At approximately 6:17 p.m., the Nurses were still unable to trace Lily's heartbeat. A bedside ultrasound showed that Lily had no heartbeat and was not moving. Dr. Spivey was called at 6:30 p.m. to come to the hospital. When he arrived,

9477630v.1

he confirmed that Lily had died in-utero. He ordered a C-section to deliver Lily's body. At or around 8:21 p.m. on August 24, 2018, Dr. Spivey delivered Lily stillborn via C-section. When Lily's body was delivered the umbilical cord was wrapped several times around her body. Experts on both sides have concluded Lily's umbilical cord became compressed prior to her death reducing oxygen to her. Her autopsy confirmed that she died due to hypoxia (lack of oxygen) due to an umbilical cord accident.

## 2. Listing of all rules, regulations, statutes, ordinances, and illustrative case law creating a specific legal duty relied upon by Plaintiffs:

At all times relevant to this litigation Defendant Valerie Smith, CNM, while caring for Becky Wise and baby Lily Wise on August 24, 2018, failed to exercise that degree of care, skill and diligence ordinarily employed by health care providers under similar conditions and like surrounding circumstances. O.C.G.A. § 51-1-27.

At all times relevant to this litigation Defendants Valerie Smith, CNM, while caring for Becky Wise baby Lily Wise on August 24, 2018, was acting incident to and within the course and scope of her agency or employment with Defendant Harbin Clinic, LLC. Harbin Clinic, LLC is therefore vicariously liable for the conduct of Defendant Smith. O.C.G.A. § 51-2-2. *Hoffman v. Wells*, 260 Ga. 588, 589, 397 S.E.2d 696 (1990).

9477630v.1

Jay and Becky Wise bring this claim for wrongful death premised on the professional negligence (medical malpractice) of Defendants. O.C.G.A. § 51-1-27 (medical malpractice); O.C.G.A. § 51-4-4 (wrongful death, child); O.C.G.A. § 19-7-1 (recovery for wrongful death of child); *see, also, e.g.*, *Allrid v. Emory University*, 166 Ga. App. 130, 132, 303 S.E. 486, 488 (1983) (wrongful death premised on medical malpractice); *Dent v. Mem'l Hosp.,* 270 Ga. 316, 509 S.E.2d 908, 909 (1998) (same); *see also* O.C.G.A. § 51-12-1 (types of damages); O.C.G.A. § 51-12-2 (general damages); O.C.G.A. § 51-12-3 (direct and consequential damages); O.C.G.A. § 51-12-4 (damages as compensation for injury); - O.C.G.A. § 51-12-12 (discretion of jury as to damages); O.C.G.A. § 51-12-14 (interest on unliquidated damages); *OB-GYN Associates of Albany v. Littleton*, 259 Ga. 663, 664, 386 S.E.2d 146, 147 (1989), *abrogated by Lee v. State Farm Mut. Ins. Co.*, 272 Ga. 583, 533 S.E.2d 82 (2000).

3. **A separate listing of each and every act of negligence relied upon in negligence cases.**

1. Certified Midwife Smith failed to properly appreciate and respond to Lily Wise's "nonreactive" Nonstress Test (NST) results.

2. Once she was aware of Lily's nonreactive Nonstress Test results, Certified Midwife Smith failed to evaluate and/or appreciate Lily's Fetal Heart Monitor (FHM) results.

9477630v.1

3. Once she was aware of Lily's nonreactive Nonstress Test results Certified Midwife Smith failed to investigate whether Lily had been moving less than usual (Reduced Fetal Movement/ RFM) by asking Mrs. Wise, the Nurse, or reviewing the chart.

4. Certified Midwife Smith failed to appreciate and respond to Lily's RFM

5. Certified Midwife Smith failed to properly appreciate and respond to Lily Wise's Contraction Stress Test (CST) results.

6. Certified Midwife Smith failed to properly review, appreciate, and respond to Lily's Biophysical Profile (BPP) test results.

7. Certified Midwife Smith failed to properly review, appreciate, and respond to Lily's Biophysical Profile (BPP) test results indicating "no tone".

8. Once she was aware of Lily's Biophysical Profile (BPP) test results, Certified Midwife Smith failed to evaluate and/or appreciate Lily's Fetal Heart Monitor (FHM) results.

9. Once she was aware of Lily's Biophysical Profile (BPP) test results Certified Midwife Smith failed to investigate whether Lily had been moving less than usual (Reduced Fetal Movement/ RFM) by asking Mrs. Wise, the Nurse, or reviewing the chart.

10. Once she was aware of Lily's Biophysical Profile (BPP) test results Certified Midwife Smith failed to personally review and Lily's Fetal Heart Monitor (FHM) tracing results rather than relying solely on the Nurses to do so.

11. Certified Midwife Smith did not communicate concerns she should have had regarding whether Lily was getting enough oxygen to the Nurse, Charge Nurse and her supervising Physician Dr. Spivey.

12. Certified Midwife Smith did not communicate Mrs. Wise's test results and concerns she should have had regarding whether Lily was getting enough oxygen to Mrs. Wise so that Mrs. Wise could participate and be a partner in the decision of how to deliver Lily.

13. Certified Midwife Smith did not recommend a C-Section to Mrs. Wise.

14. Certified Midwife Smith did not call Dr. Spivey to ask him to come immediately to the hospital.

15. Certified Midwife Smith did not advocate for Dr. Spivey to deliver Lily by C-Section.

16. Certified Midwife Smith did not utilize the Chain of Command to get Lily delivered by C-Section if Dr. Spivey was unwilling or unable to do so.

17. Certified Midwife Smith did not speak to Mrs. Wise, or review and/or appreciate Lily's FHM results at any point before leaving the hospital.

9477630v.1

18. Certified Midwife Smith failed to Order Nursing interventions to improve oxygen and blood flow to Lily.

19. Certified Midwife Smith did not inform Dr. Spivey at handoff that she had neither been to bedside to see Mrs. Wise, had not spoken to Mrs. Wise, nor personally reviewed and/or appreciated the BPP result or FHM results herself.

20. Certified Midwife Smith did not inform Dr. Spivey that Lily's FHM tracing included concerning features indicating that Lily might not be getting enough oxygen including periods of no monitoring, a lack of accelerations, minimal variability, and recurrent decelerations.

21. Dr. Spivey failed to question Certified Midwife Smith about whether she had reviewed the FHM monitoring herself, investigated RFM by speaking to Mrs. Wise, the Nurse, or reviewing the chart, Ordered nursing interventions to improve oxygen to Lily, speaking to Mrs. Wise about RFM or the NST, BPP, CST and FHM test results and explaining to her that they were consistent with Lily receiving reduced oxygen so that Mrs. Wise could participate in the decision as to how to deliver her baby.

22. Certified Midwife Smith and Dr. Spivey proceeded to Order Induction of Labor for Mrs. Wise despite RFM, NST, BPP, CST test results and a FHM tracing that indicated that Lily had suffered ongoing hypoxia and might not withstand the additional stress of Induction.

9477630v.1

23. Certified Midwife Smith and Dr. Spivey proceeded to Order Induction of Labor for Mrs. Wise without discussing it with her.

24. Certified Midwife Smith and Dr. Spivey proceeded to Order Induction of Labor for Mrs. Wise in violation of the Standard of Care and Cartersville policy.

25. Certified Midwife Smith and Dr. Spivey failed to appreciate that there was a limited window of time to deliver Lily before she risked brain injury and/ or death.

26. Certified Midwife Smith and Dr. Spivey failed properly to weigh the risks of prompt delivery by C-section with the risk of brain injury and death to Lily if she proceeded with Induction by Cytotec.

27. Certified Midwife Smith and Dr. Spivey failed to advocate for C-Section delivery of Lily Wise before she died.

28. Certified Midwife Smith failed to utilize the Chain of Command, if necessary, to ensure delivery of Lily Wise before she died.

29. Certified Midwife Smith and Dr. Spivey acted outside of the requisite Standard of Care and were negligent in all of the aforementioned acts and omissions.

30. The Cartersville Nurses failed to appropriately monitor Lily Wise on FHM.

9477630v.1

31. The Cartersville Nurses failed to appropriately notify Certified Midwife Smith that Lily's FHM indicated a potential interruption in the oxygen pathway.

32. The Cartersville Nurses failed to appropriately notify Certified Midwife Smith and/or Dr. Spivey when there were unable to continuously monitor Lily on FHM after 3:47 p.m.

## 4. <u>Items of Damages Claimed by Plaintiffs</u>

Damages in this wrongful death lawsuit include the value of Lily Wise's lost expected future earnings, the value of Lily Wise's lost expected future household services, and the full value of Lily Wise's life, without deduction for necessary or personal expenses.

**1. Value of lost expected future earnings as proffered by Plaintiffs:**

a. $1,581,272 (High School Diploma)

b. $2,022,152 (Some College, No Degree)

c. $3,343,723 (College Degree, No Master's Degree)

(Dollar amounts listed above are as calculated by Plaintiffs' economist expert, Bruce Seaman, Ph.D., and included with his report at the time of Plaintiffs' filing of Dr. Seaman's Rule 26(A)(2) Expert Disclosure on May 14, 2021. The referenced amounts were calculated by Dr. Seaman based on the present value of his economic projections at the time the report was prepared and filed. Plaintiffs anticipate that Dr. Seaman may revise these amounts shortly prior

to the trial of this case, such that the calculations presented to the jury have been updated to reflect the present value of Dr. Seaman's projections at the time of trial.)

**2. Value of lost expected future household services as proffered by Plaintiffs:**

$978,579 (Dollar amounts listed above are as calculated by Plaintiffs' economist expert, Bruce Seaman, Ph.D., and included with his report at the time of Plaintiffs' filing of Dr. Seaman's Rule 26(A)(2) Expert Disclosure on May 14, 2021. The referenced amounts were calculated by Dr. Seaman based on the present value of his economic projections at the time the report was prepared and filed. Plaintiffs anticipate that Dr. Seaman may revise these amounts shortly prior to the trial of this case, such that the calculations presented to the jury have been updated to reflect the present value of Dr. Seaman's projections at the time of trial.)

**3. The full value of Lily Wise's life, without deduction for necessary or personal expenses:**

Plaintiffs' economist expert, Bruce Seaman, Ph.D., has included in his expert opinions illustrative values for lost discretionary waking hours not otherwise accounted for, as evidence potentially helpful to the jury in its determination of the "full value" of Lily's life: *Purely illustrative value of lost waking hours*

*@$7.25: $ 1,866,832, Purely illustrative value of lost waking hours @$12.10*

*$ 3,115,677, Purely illustrative value of lost waking hours @$18.15 (1.5 x*

*$12.10): $ 4,673,516.*

(These illustrative values are as offered by Plaintiffs' economist expert, Bruce

Seaman, Ph.D., and included with his report at the time of Plaintiffs' filing of

Dr. Seaman's Rule 26(A)(2) Expert Disclosure on May 14, 2021. The

referenced amounts were calculated by Dr. Seaman based on the present value

of his economic projections at the time the report was prepared and filed.

Plaintiffs anticipate that Dr. Seaman may revise these amounts shortly prior

to the trial of this case, such that the calculations presented to the jury have

been updated to reflect the present value of Dr. Seaman's projections at the

time of trial.)

### 4. <u>Citations to Authority</u>

The full value of the life of the decedent includes both the economic value of

the deceased's normal life expectancy, and the intangible element incapable

of exact proof. *See S. Fulton Med. Ctr., Inc. v. Poe*, 224 Ga. App. 107, 112,

480 S.E.2d 40, 45 (1996). *See also* O.C.G.A. §§ 19-7-1, 51-4-1.

9477630v.1

# ATTACHMENT D (DEFENDANTS' OUTLINE OF THE CASE)

This is a claim for wrongful death arising out of the intrauterine fetal demise of Lily Wise on August 24, 2018.

Becky Wise presented to the obstetrical department of Harbin Clinic to establish prenatal care for her second pregnancy. At Harbin Clinic, multiple providers saw Mrs. Wise during her pregnancy, including Dr. Steven Spivey and Valerie Smith, a certified nurse midwife. As the anticipated date to deliver approached, Mrs. Wise provided informed consent for the medical providers at Harbin Clinic to deliver her child. Mrs. Wise consented to a surgical delivery by C-section and induction or augmentation of labor with Pitocin, a medicine which is a synthetic version of oxytocin, the natural hormone that causes the uterus to contract to deliver, if needed.

Mrs. Wise presented to Cartersville Medical Center around 1017 on August 24, 2018, with complaints of feeling contractions. Mrs. Wise was directed to the labor and delivery department for triage. In the Cartersville Medical Center labor and delivery department, nurses employed by Cartersville Medical Center are the primary caregivers for patients who are or may be in labor. Medical providers like Dr. Spivey and Ms. Smith do not provide and are not expected to provide direct care at the bedside until contacted by the nurses.

9477630v.1

In triage, Mrs. Wise was connected to an electronic fetal heart rate monitor, which provides information about the fetus' response to different stimuli. Mrs. Wise was also connected to an ultrasound device that recorded contractions of the uterus, including information about when contractions occur, how long they last, and how far apart they are. The Cartersville Medical Center labor and delivery nurses are trained to interpret both the fetal heart rate and contraction readouts and to identify patterns of activity. The fetal heart rate and contraction patterns of activity can help determine whether a patient is in labor, whether the fetus is awake or sleeping, and how well the fetus is doing inside the uterus both before and during labor. Importantly, the Cartersville Medical Center labor and delivery nurses are supposed to be trained and responsible for assessing whether the fetus may be experiencing a potentially life-threatening condition called metabolic acidosis, which can be related to prolonged episodes of decreased oxygenation to vital organs. When the Cartersville Medical Center labor and delivery nurses see concerning patterns develop on the fetal heart rate monitor, they are required to notify a medical provider, such as Ms. Smith or Dr. Spivey.

During the triage, Mrs. Wise was not in labor and not experiencing regular uterine contractions that were causing her cervix to dilate. Mrs. Wise had a type of fetal surveillance test called a non-stress test. The non-stress test was reported as being "non-reactive," meaning that the fetal heart rate did not increase over the

baseline rate by a defined amount and for a sufficient period of time in response to fetal movement. When there is a non-reactive non-stress test, the standard practice is to order further testing.

Upon receiving the report of the non-reactive non-stress test from the nurse, Ms. Smith consulted Dr. Spivey in their office. Together, they decided to get another type of test, known as a biophysical profile. A biophysical profile is an ultrasound of the baby that looks for four (4) biometric markers of fetal wellbeing: amniotic fluid levels, breathing movements, gross body movements, and tone in the arms, hands, legs, or feet. As the person performing the ultrasound observes the presence or absence of a particular biomarker, they "score" it with a two if the marker is observed or zero if the marker is not observed. The biomarker scores are then combined with the results of the non-stress test (0) to get a total score up to ten (10).

Here, the result of the biophysical profile was a score of 6 out of 10. This is considered to be an "equivocal" result. The primary labor and delivery nurse, Ashley Allgood, reported the results of the biophysical profile score to Ms. Smith after she completed the delivery of another patient. Ms. Smith returned to the office and consulted with Dr. Spivey. Together, they developed a plan to induce labor using medications based on Mrs. Wise's written consent. Ms. Smith and Dr. Spivey communicated written orders to the Cartersville Medical Center labor and delivery nurses to admit Mrs. Wise as an inpatient, administer the medications and monitor

9477630v.1

the fetus continuously. Ms. Smith and Dr. Spivey instructed the Cartersville Medical Center labor and delivery nurses to decrease or stop the medications if the fetal heart rate pattern became "non-reassuring," which is a description of a potentially concerning pattern on the fetal heart rate monitor, and to notify the medical provider. Following the schedule Dr. Spivey and Ms. Smith had established well before the events at issue, Ms. Smith handed the care of Mrs. Wise off to Dr. Spivey at 3:00 pm (1500).

The written orders for induction and monitoring were delivered to Cartersville Medical Center at 3:25 pm (1525). Unknown to Dr. Spivey or Ms. Smith, Ms. Allgood began having trouble monitoring the fetal heart rate starting around 2:47 pm (1447). Ms. Allgood eventually obtained a consistent tracing of the fetal heart rate around 3:14 pm (1514).

Around 3:44 pm (1544), the fetal heart rate monitor stopped recording continuously and the fetal heart rate pattern became non-reassuring. This pattern continued but Ms. Allgood was no longer monitoring the fetus continuously as ordered. From almost one hour from 3:44 pm until 4:43 pm, Ms. Allgood did not document any assessment of the fetal heart rate. At 4:43 pm, Ms. Allgood tried to reposition Mrs. Wise to help locate the fetal heart rate on the monitor and to help the fetus get oxygen. At 5:06 pm, Ms. Allgood asked another nurse, Sarah Glouse, to help her. At 5:47 pm, Ms. Allgood and Ms. Glouse asked a third nurse to assist. The

Cartersville Medical Center nurses did not contact Dr. Spivey, Ms. Smith, or any other medical provider during this time.

At 6:17 pm, another nurse midwife, Rebecca Evans, went to the bedside to use an ultrasound to try to detect the fetal heart rate. Eventually, Dr. Spivey was called to report that the fetus had died. Dr. Spivey then performed a C-section.

The legal issues to be tried are:

(1) The Standard of Care applicable to Valerie Smith, CNM

(2) Whether Valerie Smith, CNM deviated from the Standard of Care applicable to her

(3) If Valerie Smith, CNM deviated from the applicable Standard of Care, whether that deviation was the cause-in-fact of the death of Lily Wise

(4) If Valerie Smith, CNM deviated from the applicable Standard of Care, whether that deviation was the proximate cause of the death of Lily Wise

(5) The economic value of Lily Wise, who died before delivery from the uterus

(6) Whether the intervening acts and omissions of the Cartersville Medical Center labor and delivery nurses break the chain of causation

(7) Whether the intervening acts and omissions of the Cartersville Medical Center labor and delivery nurses were the actual cause of the death of Lily Wise

(8) Whether the acts and omissions of the Cartersville Medical Center labor and delivery nurses were the sole proximate cause of the death of Lily Wise

(9) Apportionment of fault to Cartersville Medical Center, who settled the claim before the lawsuit was filed

The supporting legal authorities are:

1. Intervening act of a third party - Jordan v. Everson, 806 S.E.2d 533, 534 (2017); Harmon v. City of Coll. Park, 460 S.E.2d 554, 557 (Ga.App. 1995); McQuaig v. McLaughlin, 440 S.E.2d 499, 502–03 (Ga.App. 1994).

2. Apportionment of fault and/or damages - O.C.G.A. §51-12-33; Zaldivar v. Prickett, 774 S.E.2d 688, 697 (Ga.App. 2015)

3. Wrongful death damages are the full value of the life of the decedent to the decedent – O.C.G.A. §51-4-2, et seq.

4. The full value of the life of the decedent has an economic component and, in some cases, an intangible component – Consolidated Freightways Corp. of Del. v. Futrell, 410 S.E.2d 751, 752 (Ga.App. 1991)

5. Damages in case for wrongful death of unborn child are limited to economic damages – Childs v. U.S., 932 F.Supp.1570 (S.D.Ga. 1996)

6. The intangible component of wrongful death damages is not mandatory–- Childs v. U.S., 932 F.Supp.1570, 1582 (S.D.Ga. 1996)

54

7. A child must be born alive to recover their own damages from an alleged tortfeasor – <u>Peters v. Hospital Authority of Elbert Co.</u>, 458 S.E.2d 628 (Ga. 1998)

9477630v.1

# ATTACHMENT E (STIPULATED FACTS)

1. On August 24, 2018, Becky Wise presented to Cartersville Medical Center with complaints of contractions.

2. On August 24, 2018, Becky Wise was a patient of Harbin Clinic, LLC.

3. On August 24, 2018, Valerie Smith, CNM was the nurse midwife on-call for Harbin Clinic, LLC patients who presented to the labor and delivery department at Cartersville Medical Center.

4. At all times relevant to this litigation on August 24, 2018, Defendant Valerie Smith, CNM was acting incident to and within the course and scope of her agency or employment with Defendant Harbin Clinic, LLC.

5. Becky Wise, a prenatal patient of Midwife Valerie Smith, CNM, Dr. Steven Spivey, M.D., and the Harbin Clinic, presented to Labor and Delivery triage at Cartersville Medical Center at or around 10:17 a.m. on August 24, 2018.

6. Mrs. Wise was 39 weeks pregnant, which is considered "term."

7. Mrs. Wise had a healthy pregnancy up to that point.

8. Mrs. Wise came to the hospital because she had been having contractions.

9. Lily Wise was delivered stillborn at or around 8:21 p.m. on August 24, 2018.

9477630v.1

# **ATTACHMENT F-1 (PLAINTIFF'S WITNESSES)**

**Plaintiff *will* have present at trial:**

1. Becky Wise may be contacted through Plaintiffs' counsel;

2. Jay Wise may be contacted through Plaintiffs' counsel.

**Plaintiff *may* have present at trial:**

1. Defendant Valerie Smith, CNM, may be contacted through her counsel;

2. Steven Spivey, M.D., may be contacted through Daniel J. Huff, Huff Powell Bailey, LLC, 999 Peachtree Street, Suite 950, Atlanta, Georgia 30309;

3. Ashley Allgood, RN, may be contacted through Brian K. Mathis, Huff Powell Bailey, LLC, 999 Peachtree Street, Suite 950, Atlanta, Georgia 30309;

4. Kelly Costner, RN, may be contacted through Brian K. Mathis, Huff Powell Bailey, LLC, 999 Peachtree Street, Suite 950, Atlanta, Georgia 30309;

5. Sarah Glouse, RN, may be contacted through Brian K. Mathis, Huff Powell Bailey, LLC, 999 Peachtree Street, Suite 950, Atlanta, Georgia 30309;

6. Beverly Rogers, M.D., 1999 Glenridge Place, Atlanta, Georgia, 30342;

7. Corporate Representative of Cartersville Medical Center, may be contacted through Brian K. Mathis, Huff Powell

8. Any records custodian to authenticate records and documents produced in discovery;

9477630v.1

9. All other persons identified in any Party's responses to any written discovery or in depositions;

10. All other witnesses listed by any Defendant.

**Plaintiff *may* have the following expert witnesses present at trial:**

1. Reid Goodman, M.D., 6000 S Moline Way, Englewood, Colorado, 80111;

2. Mark Landon, M.D., 500 S. Parkview Avenue, Apartment PH1, Bexley, Ohio, 43209;

3. Pam Kelly, RN, CNM, 5706 Kneeland Lane, Tampa, Florida, 33625;

4. Rebecca Baergen, M.D. 7 Rachel Way, Bedford, New Hampshire, 03110;

5. Bruce Seaman, Ph.D., 748 Myrtle Street, N.E., Atlanta, Georgia, 30308.

**Summary of Expected Testimony by Plaintiffs' Expert Witnesses**

**1. Reid Goodman, M.D. (OBGYN)**

Dr. Goodman, an obstetrician/gynecologist, is expected to testify generally concerning the professional standards of care applicable to labor and delivery medical care providers. Dr. Goodman is further expected to testify consistent with his Report and Deposition to both Standard of Care and Causation that Defendant Valerie Smith, CNM, was negligent and violated this Standard of Care by:

a) Failing to come to Mrs. Wise's bedside to assess Becky and Lily Wise at any point after assuming care of these patients;

58

b) Failing to personally assess and/or appreciate the FHM at any point during her care of Becky and Lily Wise;

c) Failing to personally assess and/or appreciate the FHM at any point before leaving the hospital;

d) Failing to personally review and/or appreciate the FHM after learning of a nonreactive NST;

e) Failing to investigate the possibility of Reduced Fetal Movement with Mrs. Wise, the Nurse, or the chart after learning of a nonreactive NST;

f) Failing to come to bedside or to personally review the FHM after receiving 6/10 BPP;

g) Failing to review the BPP report to identify the individual parameter of no tone;

h) Failing to appreciate that no tone was predictive of acidemia;

i) Failing to review or appreciate the FHM had periods of no tracing and no accelerations, minimal variability, and variable and late decelerations and a +CST;

j) Allowing Mrs. Wise to be "off monitor" for any period of time;

k) Failing to explain to Mrs. Wise that Lily's RFM, and NST, BPP, FHM and CST test results were concerning for an interruption in the oxygen pathway;

l) Failing to recommend delivery of Lily by C-Section;

m) Failing to allow Mrs. Wise to participate in the decision about how to deliver Lily;

n) Failing to advocate for C-Section delivery if Mrs. Wise agreed;

o) Failing to ensure Dr. Spivey came to the hospital immediately to perform a C-Section or utilize the Chain of Command if he was unable or unwilling to do so;

p) Abandoning her patient while she was still on call pursuant to the call schedule by leaving the hospital at 3:00 p.m. without informing the nurse and without ensuring that Lily's FHM was reassuring before she left;

q) Failing in her handoff to Dr. Spivey;

r) Failing to review and properly assess the FHM herself rather than relying on a Nurse to do so;

s) Failing to assess and to appreciate the noted absence of accelerations and presence of late and variable decelerations on the tracing;

t) Failing to assess and to appreciate the persistent minimal variability and recurrent decelerations on the tracing;

u) Failing to assess and to appreciate the positive contraction stress tests shown on the FHM tracing;

60

v) Failing to ensure that Mrs. Wise was continuously monitored;

w) Ordering or allowing the monitor to be removed from Mrs. Wise for an hour and allowing her to ambulate despite a nonreactive NST, persistent minimal variability, no accelerations, and late and variable decelerations;

x) Failing to assess and to appreciate the inadequate or absent tracing for another full hour after the BPP and up until and after Certified Midwife Smith left for the weekend at 1500;

y) Improperly ordering induction of labor by Cytotec which could have taken hours or days in violation of the Standard of Care and Cartersville Policy;

z) Failing instead to move toward a prompt C-section at that time;

aa) Failing to thoroughly communicate with the nurses and regarding the FHM tracing;

bb) Failing to appreciate that they had a limited window of time to deliver Lily before suffered brain injury and death.

Dr. Goodman is critical of the labor and delivery nurses for their failures in continuously tracing Lily's heart monitoring and in communicating Lily's heart monitoring to Midwife Smith and Dr. Spivey.

Dr. Goodman also holds the Causation opinions that:

a) Lily Wise was neurologically intact and un-injured when her mother arrived at Cartersville Medical Center;

b) The FHM tracing along with the BPP score of 6/10 and no tone is consistent with a baby who suffered progressive hypoxia and predictive of acidemia;

c) Had c-section been called at around 3:48 p.m. or prior Lily would have been born alive and unharmed;

d) That Lily's death from interruption of the oxygen pathway including from cord compression was foreseeable.

## 2. Mark Landon, M.D. (OBGYN/MFM)

Dr. Landon, an obstetrician/gynecologist with a specialty in maternal-fetal medicine, is expected to testify consistent with his report and deposition to both Standard of Care and Causation. Dr. Landon is expected to testify that Defendant Valerie Smith, CNM failed to meet acceptable standards of care for the management of Becky Wise's labor and delivery on August 24, 2018, and that Certified Midwife Smith's deviations from the Standard of Care were proximate in causing the death of Lily Wise:

a) Certified Midwife Smith violated the Standard of Care:

a. In failing to personally review and/or appreciate Lily's FHM results;

b.  In failing to assess Mrs. Wise at bedside and inquire about RFM;

c.  In failing to explain the Nonreactive NST and BPP and FHM and CST results and RFM and related concerns about baby Lily's oxygenation to Becky Wise;

d.  In failing recommend C-Section to Becky Wise;

e.  In failing to allow Mrs. Wise the opportunity to express her wishes as to how she wanted her baby delivered;

f.  In failing to advocate for C-Section if Mrs. Wise wanted her baby delivered by C-Section.

g.  In failing to advocate for Dr. Spivey to come to the hospital to evaluate Mrs. Wise for C-Section delivery;

h.  In failing to advocate for C-Section and in utilizing the Chain of Command if that were not successful;

i.  In ordering Induction with Cytotec for delivery of Lily Wise;

j.  In leaving the hospital before reviewing and/or appreciating the FHM;

k.  In leaving the hospital before determining that the FHM was normal; and

l.  In failing to ensure Lily was delivered before she suffered brain injury and death.

63

b) That the FHM at approximately 11:00 a.m. indicated a well-oxygenated, metabolically normal fetus;

c) That Lily Wise was not substantially brain damaged and dying prior to Becky Wise's presentation to Cartersville Medical Center.

d) That Lily's RFM was consistent with a fetus experiencing ongoing hypoxia;

e) That Lily's FHM pattern following 11:00 a.m. was consistent with a fetus experiencing ongoing hypoxia;

f) That the BPP results of 6/10 with no tone was consistent with a fetus experiencing worsening hypoxia and acidemia;

g) That the cause of Lily Wise's death was cord compression resulting in reduced oxygen and blood flow to her to the point of brain injury and death;

h) That Lily's death from interruption of the oxygen pathway including from cord compression was foreseeable;

i) That had delivery been called for at approximately 3:48 p.m., Lily would have been born alive.

j) That had Lily been delivered at any time before she lost her heartbeat she would have been likely survived.

Dr. Landon is critical of the labor and delivery nurses for their failures in continuously tracing Lily's heart monitoring and in communicating Lily's heart monitoring to Midwife Smith and Dr. Spivey.

### 3. **Pam Kelly, RN, CNM** (Certified Nurse Midwife)

Nurse Midwife Kelly is expected to testify generally concerning the standards of care applicable to nurse midwives providing labor and delivery case to pregnant mothers and their unborn babies, and specifically that Defendant Valerie Smith, CNM was negligent and violated this Standard of Care in her treatment of Becky and Lily Wise consistent with her Report and Deposition testimony including but not limited to Certified Midwife Smith's violations of the Standard of Care :

a) Certified Midwifes have advanced training and practice both independently and under the direct supervision, collaboration, and referral with Obstetricians;

b) The Standard of Care requires a midwife or OB/GYN responsible for delivering a baby, and who learns that the baby may not be receiving sufficient oxygen, to make a reasonable investigation to determine whether the baby is, in fact, receiving sufficient oxygen;

c) In caring for Becky and Lily Wise on August 24, 2018, Certified Midwife Smith was aware that baby Lily might not be receiving sufficient oxygen based on her nonreactive NST results;

d) That upon learning of Lily's nonreactive NST results beyond approximately one-hour Certified Midwife Smith had a duty under the

Standard of Care to investigate further;

e) As part of this investigation, Certified Midwife Smith was required to ask Mrs. Wise if she had noticed decreased fetal movement, and/or ask the Nurse, and/or reviewed the chart for this information;

f) As part of this investigation, Certified Midwife Smith was required to review the FHM tracing herself rather than rely on the nurse's interpretation;

g) Had Certified Midwife Smith reviewed the FHM herself she would have recognized it was consistent with an interruption of the oxygen pathway including cord compression;

h) Certified Midwife Smith was then required to order a Biophysical Profile "stat" and inquire from the Nurse and review the results;

i) Once Certified Midwife Smith received the BPP results of 6/10 she had to understand that the result was "equivocal' – meaning that it could neither confirm nor rule out that Lily was receiving sufficient oxygen;

j) Once Certified Midwife Smith received the BPP results of 6/10 she had to review the individual parameters of the test result. Having done so she would have to recognize that the lack of tone is predictive of fetal acidemia;

k) Having received and reviewed the BPP test results Certified Midwife

Smith had to, if she had not already done so, investigate Mrs. Wise's perception of fetal movement to determine if Lily was moving less than usual;

l) Having received and reviewed the BPP test results Certified Midwife Smith also had a duty to review the electronic fetal monitoring ("FHM") tracing herself to determine whether it was consistent with a well-oxygenated baby. A midwife should rely on the nurses to review the FHM tracing only when she cannot personally review the tracing; while nurses can be the "eyes and ears" of a doctor and midwife, the midwife must be her own eyes and ears when she is able;

m) If she had done so and appreciate the FHM results she would have recognized periods of no tracing, a positive CST test, recurrent decelerations (late and variable), reduced variability, and no accelerations.

n) The midwifery Standard of Care requires a midwife to communicate to a pregnant mother significant facts regarding the health of her baby and Certified Midwife Smith breached this Standard of Care in not communicating anything to Mrs. Wise about Lily's RFM and NST, BPP, FHM and CST test results and concerns she should have had regarding whether Lily was getting enough oxygen;

o) Certified Midwife Smith needed to review the FHM tracing and/or

appreciate it before leaving the hospital.

p) Had Certified Midwife Smith done so then she would have seen that the FHM was not tracing Lily's heart adequately between 1400 and 15:15, and, as such, could not provide her caregivers any information on whether Lily was getting sufficient oxygen, and that prior to 1400 was persistent Category II and outside the Clarke Algorithm, and after 3: 15 was deteriorating further.

q) If Certified Midwife Smith reviewed or appreciated that Lily's FHM tracing was not tracing Lily's heart adequately and was, therefore, uninterpretable from 1400 to 15:15 the Standard of Care would have required her to watch that tracing for at least 30 minutes and until she could tell whether Lily was getting sufficient oxygen;

r) The midwifery Standard of Care required Certified Midwife Smith to communicate to Mrs. Wise significant facts and complete and accurate information regarding the health of her baby including the RFM, NST, BPP, FHM and CST results so that she could make informed health decisions including, but not limited to participating in the decision about how to deliver her baby including Mrs. Wise's right to determine the extent of her participation in the decision-making process.

s) One reason why the midwifery Standard of Care requires these significant

facts to be communicated to the mother is that the mother is considered a partner in her baby's care including decisions about how to safely manage labor and delivery of her baby;

t) Certified Midwife Smith was required to share relevant information with Mrs. Wise so that she could make informed decisions.

u) In fact, respect for autonomy is basic to midwifery care and is foundational to a partnership that fosters open communication between a midwife and a woman;

v) The ACNM recognizes and values the importance of including patients and families as informed, collaborative and active participants in the care process considering this essential for the promotion of safe outcomes.

w) Certified Midwife Smith was required to recommend C-Section delivery for Lily to Mrs. Wise.

x) Certified Midwife Smith was required to advocate for C-Section delivery if Mrs. Wise chose C-Section delivery.

y) Certified Midwife Smith was required to request Dr. Smith to come to the hospital immediately to perform a C-Section to deliver Lily.

z) If Dr. Spivey refused or was unable to come immediately to the hospital, Certified Midwife Smith had to use of the "Chain of Command" to find another physician to either persuade Dr. Spivey to perform the procedure,

or, in the alternative, to perform the procedure themselves;

Midwife Kelly is critical of the labor and delivery nurses for their failures in continuously tracing Lily's heart monitoring and in communicating Lily's heart monitoring to Midwife Smith and Dr. Spivey.

### 4. Rebecca Baergan, M.D. (Pathologist)

Dr. Baergen, a placental pathologist, is expected to testify generally concerning causation. Specifically, Dr. Baergen is expected to testify to the following opinions, to a reasonable degree of medical certainty:

a) That examination of pathological specimens from Lily Wise's autopsy reveals the presence of hypoxic injury to multiple organs, and lack of significant post-mortem changes, which are consistent with recent death;

b) That examination of the placental pathology specimens reveals the presence of high-grade fetal vascular malperfusion, thrombosis, villous-stromal-vascular karyorrhexis and early avascular villi, and meconium-filled macrophages and focal choragiosis, which findings are consistent with intrauterine hypoxia;

c) That the medical records of Becky and Lily Wise indicate the presence of a complex cord entanglement, with the cord wrapped around Lily's neck three times, around her arm twice, and then around her body. In the

pathology lab, 60 centimeters of cord were received, and the cord was thin and less than 1 centimeter in diameter (an excessively long cord);

d) That Lily Wise's cord was compressed;

e) That the pathologic evidence is that compression of the cord was likely ongoing for days to weeks prior to delivery;

f) That the timing of when the the compression of the cord resulted in hypoxia/reduced oxygen to Lily requires clinical correlation;

g) That Lily's pathology shows evidence of an acute component of cord compression which would have occurred close in time to Lily Wise's death.

## 5. <u>Debra Heller, M.D. (Placental Pathologist)</u>

Plaintiff intends to play the trial deposition testimony of Dr. Heller (previously recorded) in Plaintiffs' case-in-chief.

Defendants' object to this. The deposition was noticed for use at trial and was taken by and at the expense of the Defendants. The deposition was to proceed as if the witness was appearing live at trial. Plaintiffs did not subpoena the witness and would not have been able to present the testimony during their case-in-chief but for Plaintiffs request to reschedule the trial and the resulting compromise of agreeing to take depositions of two witnesses for use in evidence. Plaintiffs should not be permitted to take advantage of the situation

and alter the presentation of evidence unnaturally simply because Defendants agreed to take evidentiary depositions. Defendants are prepare to argue this point at the pretrial conference and make a record.

**6. <u>Bruce Seaman, Ph.D.</u>**

Dr. Seaman, an economist, is expected to testify generally on the subject of damages. More specifically, Dr. Seaman will provide testimony concerning the tangible economic value of the life of Lily Wise, including Lily's expected future earnings capacity, and the expected value of future household services consistent with his Report and Deposition testimony. Dr. Seaman will further testify concerning the "lost discretionary waking hours not otherwise accounted for" by Lily's premature death, in order to provide the jury with potentially useful information relevant to the intangible value of Lily's life, including illustrative valuations of such lost hours. Dr. Seaman's testimony will also identify the actuarial basis for identifying Lily Wise's probable life expectancy.

## <u>Attachment F-2 (DEFENDANTS' WITNESSES)</u>

Valerie Smith – may be contacted through her counsel; no subpoena necessary.

Corporate representative(s) of Harbin Clinic, LLC ((a) Steven Spivey, M.D.; (b) Edward McBride, M.D.) – may be contacted through counsel; no subpoena necessary.

Steven Spivey, M.D. – may be contacted through Daniel J. Huff at Huff Powell Bailey.

9477630v.1

Becky Wise – may be contacted through counsel.

Joshua Wise – may be contacted through counsel.

Sarah Glouse, RN – may be contacted through Brian Mathis at Huff Powell Bailey.

Ashley Allgood, RN – may be contacted through Brian Mathis at Huff Powell Bailey.

Rachel Turner, RN – may be contacted through Brian Mathis at Huff Powell Bailey.

Kelly Costner, RN – may be contacted through Brian Mathis at Huff Powell Bailey.

Dana McBurnett, RN – may be contacted through Brian Mathis at Huff Powell Bailey.

Rebecca Evans, CNM – may be contacted through Paul Weathington at The Weathington Firm.

Beverly Rogers, M.D. – 1999 Glenridge Place, Atlanta, GA 30342.
Fayyaz Barodawala, M.D. – believed to be 215 Sheraton Boulevard, Suite 2, Macon, Georgia 31210; 478-757-8868.

Jordan Doss, RVT, RDMS – maybe contacted through Brian Mathis at Huff Powell Bailey.

Courtney Perez, M.D. – believed to be 5665 New Northside Drive, Suite 320, Atlanta, GA 30328; 770-874-5400

Catherine Creamer, RN – may be contacted through Brian Mathis at Huff Powell Bailey.

Kimberly Millsap, CNM – may be contacted through Defendants' counsel

**Expert Witnesses Specially Retained by Defendants to Offer Opinion Testimony at Trial**

1. Jacquelyn Bodea, CNM – 34 Lobo Trail, Morganton, GA 30560; 706-817-6966.

   Ms. Bodea is expected to testify consistent with her report and deposition that Valerie Smith, CNM complied with the applicable Standard of Care , among other things. Ms. Bodea is expected to testify that the nursing staff at Cartersville Medical Center, including Ashley Allgood, RN, violated the Standard of Care  and caused the death of Lily Wise.

2. Frances Sahrphillips, CNM – 76385 Longleaf Loop, Yulee, FL 32097

   Ms. Sahrphillips is expected to testify consistent with her report and deposition that Valerie Smith, CNM complied with the applicable Standard of Care , among other things. Ms. Sahrphillips is expected to testify that the nursing staff at Cartersville Medical Center, including Ashley Allgood, RN, violated the Standard of Care  and caused the death of Lily Wise.

3. Chadburn Ray, M.D. – 520 Front Street, North Augusta, SC 29841; 706-294-4657.
   Dr. Ray is expected to testify consistent with his report and deposition that Valerie Smith, CNM complied with the applicable Standard of Care  and causation. Dr. Ray is expected to testify that the nursing staff at Cartersville Medical Center, including Ashley Allgood, RN, violated the Standard of Care and caused the death of Lily Wise.

4. Frank Manning, M.D. – 260 Third Street North, Naples, Florida 34102; 914-262-1840.

   Dr. Manning is expected to testify consistent with his report and deposition regarding causation, the biophysical profile test and score, and Standard of Care . Dr. Manning is expected to testify that the nursing staff at Cartersville Medical Center, including Ashley Allgood, RN, violated the Standard of Care and caused the death of Lily Wise.

9477630v.1

5. Debra Heller, M.D. – 310 Knickerbocker Road, Closter, NJ 07624; 201-294-8292.

   Dr. Heller is expected to testify consistent with her report and deposition regarding causation and the placental pathology, including the timing of the death of Lily Wise.

6. John Gibson, CPA – 864-940-8389.
   Mr. Gibson is expected to testify consistent with his report and deposition regarding damages.

9477630v.1

1. **Joint Exhibits**

1. Cartersville Medical Center Record for Becky Wise;

2. Harbin Clinic Medical Record for Becky Wise;

3. Fetal Heart Monitoring Medical Record

4. Call Schedule – August 2018

5. Audit Trails

6. Becky Wise Text Messages

7. Cartersville Medical Center Pre-Oxytocin and Cervical Ripening Checklist;

8. Cartersville Medical Center Policies and Procedure: Fetal Monitoring, Last Revised 11/2018;

9. Cartersville Medical Center Policies and Procedure: Patient Assessment/ Reassessment, Last Revised 7/2014;

10. Lily Wise Death Certificate;

11. Lily Wise Autopsy Report.

2. **Plaintiffs' Exhibits**

1. Nurse Protocol Agreement for Valerie Smith, CNM, 11/13/17;

2. Harbin Clinic personnel file for Valerie Smith, CNM;

3. Annuity Mortality Table for 1949, Ultimate;

4. With regard to Plaintiffs' Expert Rebecca Baergen: CV, placental pathology slides shown during Dr. Baergen's deposition;

5. Photographs of Lily Wise;

6. Photographs of Becky Wise;

7. Photographs of Jay Wise;

8. Photographs of Wise family;

9. Photographs of Cartersville Medical Center;

10. Photographs of Cartersville L&D map/ layout;

11. Photographs of Harbin Clinic, LLC;

12. DigiStrip Electronic Fetal Monitoring Animation;

13. BPP Test;

14. Order for Induction

15. Pre-Oxytocin and Cervical Ripening Checklist Policy cited in Kelly's expert report;

16. Call Schedule – August 2018;

17. S. Spivey Clinic Schedule August 2018;

18. V. Smith Clinic Schedule August 2018;

19. Harbin Doc: BPP Lack of Fetal Tone Decreased Variability;

20. Airstrip Audit Trail;

21. Placenta Findings per Autopsy Report;

22.  Autopsy Path Report;

23.  V. Smith Certified CN license;

24.  AWHONN 5th Visual Variability;

25.  Airstrip;

26.  Smith CME

27.  Smith Personnel File:

28.  Memento of Lily's Death – "Molly Bear"

29.  Memento of Lily's Death – "Dad's Lily Dogtag"2

30.  Demonstrative Exhibits & Illustrations;

31.  Enlargements and /or Highlighted Portions of Medical Records;

32.  Exemplar Testing and Tracings, Including Interactive Versions;

33.  Documents to be Used for Rebuttal or Impeachment Purposes;

34.  Any and All Affidavits;

35.  All Pleadings Filed to Date;

36.  All Defendants' Discovery Responses;

37.  All Discovery Documents;

38.  Any Documents Produced by Any Party or Third-Party During Discovery;

39.  All Documents Identified in Depositions, Including Deposition Exhibits;

40. Curriculum Vitae of all Expert Witnesses;

41. Reports from Any Expert, and any Literature or Articles Referenced Therein or Attached Thereto;

42. Notes from Any Expert;

43. All Materials Contained in Files of Expert Witnesses;

44. Curriculum Vitae of Any Defendant;

45. All Exhibits and Documents Identified by Any Defendant;

3. **Learned Treatises Expected to be Used at Trial**

1. Guidelines for Perinatal Care, Eighth Edition (American College of Obstetricians and Gynecologists, American Academy of Pediatrics, 2017);

2. Gabbe's Obstetrics, Normal and Problem Pregnancies, Seventh Edition (Landon, M.B. et al., 2016);

3. Williams Obstetrics, Twenty-Fifth Edition (Cunningham, F. Gary, et al., 2018);

4. Midwifery, Fifth Edition (King, Tekoa L. et al., 2013);

5. Induction of Labor, ACOG Practice Bulletin 107 (American College of Obstetricians and Gynecologists, 2009);

6. Management of Intrapartum Fetal Heart Rate Tracings, ACOG Practice Bulletin 116 (American College of Obstetricians and Gynecologists, 2010);

7. Patient Testing: Ethical Issues in Selection and Counseling, ACOG Committee Opinion 363 (American College of Obstetricians and Gynecologists, 2009);

8. Collaboration in Practice: Implementing Team-Based Care, Report of American College of Obstetricians and Gynecologists Task Force on Collaborative Practice (March 2016);

9. Fetal Heart Monitoring Principles and Practices, Fifth Edition (Lyndon, A. et al., Association of Women's Health, Obstetric and Neonatal Nurses, 2015);

10. Vision, Mission and Core Values, American College of Nurse-Midwives Board of Directors (April 2012);

11. Philosophy of the American College of Nurse-Midwives (American College of Nurse-Midwives Board of Directors, September 2004);

12. Code of Ethics with Explanatory Statement (American College of Nurse-Midwives Board of Directors, June 2015);

13.  Position Statement: Creating a Culture of Safety in Midwifery Care (American College of Nurse-Midwives Board of Directors, February 2016);

14.  Standards for the Practice of Midwifery (Division of Standards and Practice, American College of Nurse-Midwives Board of Directors, September 2011);

15.  System errors in intrapartum electronic fetal monitoring: a case review (Miller, Lisa A., Journal of Midwifery & Women's Health, November-December 2005);

16.  Fetal Heart Rate Monitoring, Fourth Edition (Freeman, Roger K., et al., 2012);

17.  Mosby's Pocket Guide to Fetal Monitoring, Eighth Edition (2017);

18.  AMA Principles of Medical Ethics (American Medical Association Code of Medical Ethics, June 2001);

19.  The Biophysical Profile, Walsh, M, *Glob. libr. women's med.,* (ISSN: 1756-2228) 2008; DOI 10.3843/GLOWM.10209;

20.  Intrapartum FHR Monitoring Management Decision Model[©] (Perinatal Risk Management and Education Services, 2017);

9477630v.1

21. Toolkit to Support Vaginal Birth and Reduce Primary Cesareans: Algorithm for Management of Category II Fetal Heart Rate Tracings (California Maternal Quality Care Collaborative, April 2016).

22. History and Development of Fetal Heart Assessment: A Composite Journal of Obstetric, Gynecologic & Neonatal Nursing, Volume 29, Issue 3, May 2000, Judy v Schmidt, RNC, EdD, Patricia Robin McCartney, RNC, PhD;

23. Creasy & Resnick's Maternal-Fetal Medicine: Principles and Practice, Charles J. Lockwood, M.D., MHCM, Elsevier 7th Edition (2013);

24. Manning FA: Fetal Biophysical Profile: a critical appraisal. Clin Obstet Gynecol 45: 975-985, 2002;

25. Manning FA, Morrison !, Harman CR et al: The abnormal fetal biophysical profile score V Predictive accuracy according to score composition. American Journal of Obstetric Gynecology 162: 918, 1990;

26. Manning FA, Harman CR. Morrison I: Fetal assessment based on fetal biophysical profile scoring, Part IV. Analysis of perinatal morbidity and Mortality. American Journal of Obstetric Gynecology 162: 703, 1990;

9477630v.1

27.  Manning FA, Baskett TF, Morrison, I: fetal biophysical profile scoring: A prospective study in 1,184 high-risk patients. American Journal of Obstetric Gynecology 140: 289, 1981

28.  Manning FA, Morrison I, Lange IR et al: Fetal assessment based on fetal biophysical profile scoring: Experience in 12,620 referred high-risk pregnancies, Part 1. Perinatal mortality by frequency and etiology. American Journal of Obstetric Gynecology 151: 343, 1985;

29.  Manning FA, Lange IR, Morrison I et al: Fetal biophysical profile score and the nonstress test: A comparative trial. American Journal of Obstetric Gynecology 64: 326, 1984;

30.  Manning FA, Lange IR, Morrison I et al: Fetal biophysical profile scoring: selective use of the nonstress test. American Journal of Obstetric Gynecology 156: 709-712, 1987;

31.  Manning FA, Fetal biophysical profile. Obstet Gynecol Clin North Am 26: 557-577, v, 1999;

32.  American College of Nurse Midwives (2011). Standards for the practice of midwifery;

33.  American College of Nurse Midwives (2014). Collaborative management in midwifery practice for medical, gynecologic and obstetric conditions (Position statement, approved July 27, 1992;

revised August 1997; updated and revised May 2013, updated September 2014). Silver Springs, MD: Author;

34. American College of Obstetricians and Gynecologists. (2009). Intrapartum fetal heart rate monitoring: Nomenclature, interpretation, and general management principles (ACOG Practice Bulletin 106, reaffirmed in 2017). Danvers, MA: Author;

35. American College of Obstetricians and Gynecologists. (2014). Antepartum fetal surveillance (ACOG Practice Bulletin 145) Danvers, MA: Author;

36. Association of Women's Health, Obstetric and Neonatal Nurses (2015). Fetal heart monitoring. Journal of Obstetric, Gynecologic, and Neonatal Nursing, 44, 683-686;

37. Marcones, G.A., Hankins, G.D. Prong, C.Y., Hauth, J., & Moore, T. (2008). The 2008 National Institute of Child Health and Human Development workshop report on electronic fetal monitoring: An update on definitions, interpretations, and research guidelines. Obstetrics and Gynecology, 112, 661-666;

38. Standard for Practices of Midwifery, American College of Nurse Midwives;

9477630v.1

39.    Philosophy of the American College of Nurse-Midwives, Core Competencies;

40.    Clark Algorithm;

41.    Journal of Maternal-Fetal Medicine, Biophysical Profile Test for Intrapartum Fetal Assessment;

42.    American Journal of Obstetrics and Gynecology, Volume 162, p918;

43.    Fetal Heart Monitoring: Principles and Practices, 5th Edition (2015) (AWHONN);

44.    Am J. Obstet Gynecol. 1982 Feb ; 142(3): 297-305;

45.    Mosby's Pocket Guide to fetal monitoring;

46.    Lippincott Fetal Heart Monitoring, 2012;

47.    ACOG Special Tests for Monitoring Fetal Health

48.    AGOG Technical Bulletin 207;

49.    ACOG, 2010: Freeman et al., 2012; Martin, 1978; Nageotte & Gilstrap 2009;

50.    Association and prediction of neonatal acidemia (AJOG 2012);

51.    Miller L.A. System errors in intrapartum electronica fetal monitoring: A case review. Journal of midwifery women's health 2005;

9477630v.1

52. Timing Intrapartum Management based on the evolution and duration of fetal heart rate patterns, Journal of Maternal-Fetal and Neonatal Medicine, Tony Vintzileos;

53. Guidelines for Perinatal Care, AAP, ACOG, 8th Edition, Ch 3;

54. Journal of Obstetric, Gynecologic, & Neonatal Nursing, Volume 29, Issue 3P295-305, May 2000;

55. Manning FA, Platt LD, Sipos L: Antepartum fetal evaluation: Development of fetal biophysical profile. Am J Obstet Gynecol 136: 787, 1980;

56. American College of Nurse-Midwives, "Position Statement – Creating a Culture of Safety in Midwifery Care" (March 2016);

57. National Association of Certified Professional Midwives, "Why Choose a Certified Professional Midwife for your Birth";

58. American College of Obstetricians and Gynecologists, "Decision-Making About Birth Setting Should Reflect Current Evidence, Including Contraindications, Say ACOG Guidelines" (July 2016);

59. American College of Obstetricians and Gynecologists, "Collaboration in Practice: Implementing Tram-Based Care" (March 2016);

9477630v.1

60.  American College of Obstetricians and Gynecologists, "Committee Opinion 587 – Effective Patient-Physician Communication (February 2014;

61.  AMA Journal of Ethics, May 2012

62.  AGOG Committee Opinion No. 517, February 2012, Reaffirmed 2018;

63.  ACOG Committee Opinion No. 447, Dec. 2009, Reaffirmed 2019;

64.  Ruth C. Fretts, M.D., MPH, 2021 Decreased Fetal Movement: Diagnosis, Evaluation, and Management;

65.  Guidelines for Midwifery & Women's Health – 5th Edition

## ATTACHMENT G-2 (DEFENDANTS' EVIDENCE)

### A. Joint Exhibits

1. Cartersville Medical Center Record for Becky Wise;

2. Harbin Clinic Medical Record for Becky Wise;

3. Cartersville Medical Center Pre-Oxytocin and Cervical Ripening Checklist;

4. Cartersville Medical Center Policies and Procedure: Fetal Monitoring, Last Revised 11/2018;

5. Cartersville Medical Center Policies and Procedure: Patient Assessment/ Reassessment, Last Revised 7/2014;

6. Lily Wise Death Certificate;

7. Lily Wise Autopsy Report.

### B. Defense Exhibits

1. Text messages from Becky Wise (Exhibit 3 to her deposition);

2. Audit trail for Cartersville Medical Center records for Becky Wise;

3. Policy – Cartersville Medical Center – Labor and Delivery Guidelines for Patient Admission, Transfer and Discharge dated December 2016;

4. Policy – Cartersville Medical Center – Intrauterine Resuscitation Interventions dated July 2020;

5. Harbin Clinic call schedule August 1 - August 31, 2018;

9477630v.1

6. Transvaginal ultrasound for Becky Wise – April 9, 2018;

7. Fetal heart rate tracing for Becky Wise for August 24, 2018, as marked by Ashley Allgood as part of her deposition;

8. Fetal heart rate tracing for Becky Wise for August 24, 2018, as marked by Sarah Glouse as part of her deposition;

9. Fetal heart rate tracing for Becky Wise for August 24, 2018, as marked by Kelly Costner as part her deposition.

## C. Learned Treatises Expected to be Used at Trial

1. Fetal Heart Monitoring Principles and Practices (5th edition/2nd printing);

2. Neonatal Encephalopathy and Neurologic Outcome (Second Edition), The American College of Obstetricians and Gynecologists and American Academy of Pediatrics

3. Walsh, M.D., The Biophysical Profile, Glob. libr. women's med, (ISSN: 1756-2228) 2008; DOI 10.3843/CLOWM.10209

4. Sampling and Definitions of Placental Lesions: Amsterdam Placental Workshop Group Consensus Statement (May 2016), Archives of Pathology & Laboratory Medicine

5. The Placental Pathology Report, Roberts, DJ, UpToDate (Feb. 11, 2021)

6. Intrapartum Heart Rate Monitoring, Miller, DA, UpToDate (May 1, 2020)

9477630v.1

7. Biophysical Profile Test for Antepartum Fetal Assessment, Manning, FA, UpToDate (May 4, 2021)

8. Guidelines for Perinatal Care (8th Edition), AAP Comm. on Fetus and Newborn; ACOG Comm. on Obstetric Practice Edited by Sarah J. Kilpatrick, MD, PhD, FACOG; Lu-Ann Papile, MD, FAAP; George A. Macones, MD, FACOG

9. Stillbirth: Incidence, risk factors, etiology and prevention, Fretts, C, Spong, CY, UpToDate (November 15, 2024)

10. Nuchal Cord, Schaffer, L, Zimmerman, R, UpToDate (September 12, 2024)

11. Decreased fetal movement: Diagnosis, evaluation and management, Fretts, C, UpToDate (August 9, 2024)

12. Nonstress test and contraction stress test, Miller DA, UpToDate (June 3, 2021)

13. Induction of labor, Grobman, W., UpToDate (May 13, 2020)

## ATTACHMENT H-1 (PLAINTIFFS' TRIAL BRIEF)

Plaintiffs intend to file a Trial Brief on issues before the Court prior to the start of Trial.

## PLAINTIFFS' STATEMENT FOR JURY CHARGES

Plaintiffs and Defendants agree on many facts and have significant disagreement on what a Certified Nurse Midwife like Mrs. Smith or an OB Physician like Dr. Spivey would have understood about Mrs. Lily's test results (NST, BPP, CST and FHM) and what they indicated about Lily's oxygen status.

Defendant's statement, as drafted, mischaracterizes both the Standard of Care and the implication of Lily's test results. Plaintiffs offer to work with the Defense to provide the Court with a neutral statement of the parties' contentions as a Joint Statement for Jury Charges. Plaintiff suggests the Court will be in a better position to evaluate a Statement for Jury Charges after having heard the evidence at trial.

## ATTACHMENT H-2 (DEFENDANTS' TRIAL BRIEF)

Defendants will supplement with a trial brief regarding the law that non-economic damages are not recoverable in a stillborn case.

## DEFENDANTS' STATEMENT FOR JURY CHARGES

This is a wrongful death case arising out of the death of an unborn baby. On the morning of Friday, August 24, 2018, Becky Wise presented to the emergency department at Cartersville Medical Center. She was 39 weeks pregnant and had been experiencing contractions for three days. She was moved to the labor and delivery department, where she was triaged to determine whether she was in labor. Around 1139, a labor and delivery nurse named Ashley Allgood contacted Valerie Smith, a certified nurse midwife with Harbin Clinic, to tell her Mrs. Wise was in triage and having contractions but not in labor. Ms. Smith ordered a test to check on how the baby was doing, called a non-stress test. At 1318, Ms. Smith was told the non-stress test was "nonreactive." A reactive nonstress test tells a provider that the baby is doing well. A nonreactive nonstress test does not provide any information one way or the other, so Ms. Smith ordered another test called a biophysical profile.

Ms. Smith was at the hospital helping another patient deliver. She was then told that the biophysical profile score was 6/10, which does not indicate inadequate oxygenation. Ms. Smith said she would speak with Dr. Steven Spivey, a board-

certified obstetrician, to develop a plan of care. After finishing the delivery, Ms. Smith returned to her office to discuss the plan with Dr. Spivey. The plan of care was to induce labor using medications, which included an order to the labor and delivery nurses to monitor the baby's heart rate continuously using an electronic monitor. Dr. Spivey then assumed the care of Mrs. Wise because he was on-call for all Harbin Clinic patients for the rest of the weekend. Unknown to Dr. Spivey, the labor and delivery nurses did not monitor the baby's heart rate as ordered and, around 1548, the baby's heart rate began to show troubling signs. Unknown to Dr. Spivey, the labor and delivery nurses did not monitor the baby for over an hour. Almost three hours after the monitor showed trouble, the nurses contacted Dr. Spivey to tell him that the baby had died. Dr. Spivey then delivered the baby stillborn at 2041.

It is Defendants' position that Ms. Smith complied with the standard of care applicable to her. Nothing Ms. Smith allegedly did or failed to do caused the baby to die. It is also Defendants' position that the labor and delivery nurses at Cartersville Medical Center violated the standard of care applicable to them and, as a direct result, the baby died. Had the nurses contacted anyone in a timely manner at around 1548, then more likely than not, the baby would have been born alive.

## <u>ATTACHMENT I (PROPOSED VERDICT FORM)</u>

The parties will confer on a proposed verdict form and submit same for the

Court's consideration.